Smith v. SSA                    CV-95-121-B    03/12/96

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Constance L. Smith

    v.                                          Civil No. 95-121-B

Shirley L. Chater, Commissioner
of the Social Security Administration


**O R D E R**


An Administrative Law Judge ("ALJ") denied Ms. Smith's application for Supplemental Security Income (SSI) and Social Security Disability Insurance benefits (SSDI) because he found that Ms. Smith could be employed as an information clerk, order clerk, or order-filler. After the Appeals Council refused to review the ALJ's decision, Ms. Smith moved to reverse, and the Commissioner moved to affirm. Because the ALJ failed to ask the Vocational Examiner a clear hypothetical question, excluded from his hypothetical question impairments noted during an orthopaedic evaluation which he ordered without explanation, and failed to thoroughly consider the evidence of Ms. Smith's daily activities in evaluating the credibility of her subjective complaints of pain, I deny both motions, and remand the case to the Commissioner for further proceedings consistent with this Order.

## I.  BACKGROUND[1]

Ms. Smith applied for SSDI and SSI on August 21, 1992, alleging that she was disabled due to degenerative disc disease and arthritis of the back and cervical spine.  She alleges that she initially injured her back in a fall in the early 1980s. From October, 1982 to November, 1985, Ms. Smith received continuing treatment for her back pain which sometimes radiated into her right arm and leg and for other problems such as numbness in her arms and legs on her right side when she lay down on that side. Dr. John Lambrukos, an orthopaedist, found that her pain was aggravated by prolonged sitting or standing.  Dr. Lambrukos suspected L5 and S1 radiculopathy[2] on the right side or degenerative disc disease.  Dr. William Rogers, another orthopaedist, diagnosed degenerative disc disease of the lumbar spine.  Dr. Michael Glynn, a neurologist, felt that Ms. Smith's problems were arthritic.

Ms. Smith applied for SSDI in October, 1985, lost at the reconsideration stage of review, and did not appeal that decision.  She collected disability insurance from a private insurer from 1983 until 1990, when she returned to part-time work

---

[1]  The background facts are taken from the parties' Stipulation of Facts.

[2]  A disease of the spinal nerve roots.  Stedman's Medical Dictionary 1308 (25th ed. 1990).

as a cashier at Ames Department Store. She then worked as a knitting machine operator at Providence Braid, a factory in Providence, Rhode Island, from October, 1991 until February, 1992. She last performed substantial gainful activity on April 8th, 1992.[3]

On April 8, 1992, Ms. Smith went to the Taylor Brown Health Center in Waterloo, New York, complaining of pain in her cervical and thoracic spine which radiated across her back and in her right shoulder. She also complained of pain in her right arm. X-rays analyzed by Dr. Gregoire revealed a dextroscoliotic mid-cervical curve with loss of cervical lordosis[4] consistent with muscle spasm and degenerative disc disease at C6-7. On July 13, 1992, Dr. Frank Bonnarens, an orthopaedist, examined Ms. Smith and found no localizing pathology. He recommended that she attend a pain-management clinic. The Seneca County New York Department of Social Services found Ms. Smith totally disabled for the purposes of Medicaid eligibility due to degenerative disc

---

[3] Although these dates do not accord with some of the information in the record, see, e.g. Tr. 256, I rely on the parties' stipulations.

[4] A dextroscoliotic mid-cervical curve is bend of the spine to the right in the middle of the neck. Stedman's Medical Dictionary 280, 426, 1394 (25th ed. 1990). Loss of cervical lordosis is a straightening of the spine in the neck as viewed from the side. Id. at 280, 894.

disease and arthritis of the cervical spine on September 1, 1992. In a follow-up to Dr. Bonnarens' evaluation, Dr. Steven Lasser, also an orthopaedist, saw Ms. Smith on September 17, 1992, and diagnosed degenerative lumbar disc disease. On October 23, 1992, Dr. Yutango diagnosed right shoulder bursitis, and found that she had limited elevation of her right arm.[5]

Ms. Smith moved to Florida in late 1992. She visited Community Health Services in Ocala, Florida, three times between May and June of 1993, complaining of worsening pain. Dr. Allison diagnosed degenerative disc disease and prescribed Lodine[6] and Robaxin.[7] Dr. Quinn diagnosed arthritis of the cervical and lumbar spine.

Ms. Smith has seen Dr. Harvey Deutsch, a chiropractor, two or three times per month since she returned from Florida in July, 1993. In a note dated March 8, 1994, Dr. Deutsch indicated that

---

[5]  Bursitis is inflammation of the bursa, which is "[a] closed sac or envelope lined with synovial membrane and containing fluid, usually found or formed in areas subject to friction; e.g., over an exposed or prominent part where a tendon passes over a bone." Stedman's 221, 223.

[6]  Anti-inflammatory drug used in the management of signs and symptoms of osteoarthritis and for pain management.

[7]  Indicated as an adjunct to rest, physical therapy, and other measures for relief of discomforts associated musculoskeletal conditions.

4

Ms. Smith has a degenerative disc problem at C5-6-7 and osteoarthritis in her cervical spine. Dr. Deutsch also indicated that Ms. Smith has headaches and dizziness. He concluded that "it would be a liability for her to attempt to work."

After her hearing before the ALJ on May 6, 1994, Ms. Smith was examined by Dr. Louis Fuchs, an orthopaedic surgeon, at the ALJ's request. Dr. Fuchs noted that Ms. Smith was on Relafen, which she had last taken three weeks before the exam, Dapro, which she had last taken two weeks before the exam, and over-the-counter Ibuprofen, about six daily, which she last took three days before the exam. Dr. Fuchs also noted that previous testing, including a CAT scan, MRI, and nerve conduction studies suggested degenerative disc disease and arthritis as the causes of Ms. Smith's trouble. A physical examination revealed a decreased range of motion of the cervical back in flexion, extension, and right and left rotation. Dr. Fuchs also noted that Ms. Smith's ability to bend to the left and right was limited, that she could walk on her heels and toes independently, but with back pain, and that her straight leg raising was limited bilaterally at 45 degrees with mid-back pain. Dr. Fuchs' neurologic exam revealed, inter alia that Ms. Smith's entire right arm was weakened, that her reflexes in her arms were

5

symmetrically decreased, that her grip strength was zero bilaterally, and that her reflexes in the L-5 dermatome[8] of her right foot were decreased.  Dr. Fuchs diagnosed probable cervical and lumbosacral osteoarthritis and deconditioning.

Dr. Fuchs also completed a Physical Capacities Evaluation. He found that Ms. Smith could sit for no longer than two hours continuously, walk for no longer than two hours continuously, and stand for no longer than one hour continuously.  He also found that Ms. Smith could, during an eight-hour work day, sit for a total of no longer than six hours, stand for a total of no longer than four hours, and walk for a total of no longer than four hours.  He found that Ms. Smith could lift and carry 21-25 pounds occasionally, 11-20 pounds frequently, and 0-10 pounds continuously, and that she was capable of using her hands and feet for repetitive motion without restriction.  He also found that she could never crawl, that she could bend, squat, and climb occasionally, and that she could reach continuously.[9]  Finally, he found that Ms. Smith is not restricted from being around moving machinery or driving automotive equipment, moderately

---

[8]  "the area of skin supplied by cutaneous branches from a single spinal nerve." Stedman's 419-420.

[9]  The order of these facts was simply mistakenly reversed in the Stipulation of Facts. See Tr. 263.

6

restricted from unprotected heights and marked changes in temperature and humidity, and totally restricted from exposure to dust, fumes, and gases. Dr. Fuchs opined that Ms. Smith is capable of performing clerical-type sedentary activities.

In his decision, the ALJ followed the five-step sequential evaluation outlined in 20 C.F.R. §§ 404.1520 and 416.920 and found that Ms. Smith was not disabled within the meaning of the Social Security Act. Specifically, the ALJ found: (1) Ms. Smith had not worked since April 8, 1992; (2) Ms. Smith's neck and back pain, radiating into her extremities, was a severe impairment; (3) her impairment did not meet or equal an impairment listed in Appendix 1 to Subpart P of the Social Security Regulations, (4) her impairment prevented her from performing past relevant work, but (5) she retained the residual functional capacity to work as an information clerk, an order clerk, or an order-filler. He based his determination at step five on the testimony of the VE at the May 6, 1994 hearing that a woman of Ms. Smith's age, experience, and education, limited to sedentary work at which she could stand or sit "at option," could perform those jobs.

## II.   **STANDARD OF REVIEW**

After a final determination by the Secretary and upon request by a party, this court is authorized to review the pleadings and the transcript of the record of the proceeding, and to enter a judgment affirming, modifying, or reversing the Secretary's decision. 42 U.S.C.A. §§ 405(g), 1383(c)(3) (West 1995). The court's review is limited in scope, however, as the Secretary's factual findings are conclusive if they are supported by substantial evidence. Id.; Irlanda Ortiz v. Secretary of Health & Human Services, 955 F.2d 765, 769 (1st Cir. 1991). The Secretary is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence. Id. Therefore, the court must "'uphold the Secretary's findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Secretary's] conclusion.'" Id. (quoting Rodriguez v. Secretary of Health & Human Services, 647 F.2d 218, 222 (1st Cir. 1981)). However, if the Secretary has misapplied the law or has failed to provide a fair hearing, deference to the Secretary's decision is not appropriate, and remand for further development of the record may be necessary. Carroll v. Secretary of Health & Human Services, 705 F.2d 638, 644 (2d Cir. 1983).

8

See also <u>Slessinger v. Secretary of Health and Human Services</u>,
835 F.2d 937, 939 (1st Cir. 1987).

## III. <u>DISCUSSION</u>

At step five of the sequential analysis, the Commissioner
bears the burden of proving that there are jobs available in the
national economy that the claimant could perform. <u>Goodermote v.</u>
<u>Secretary of Health and Human Services</u>, 690 F.2d 5, 7 (1st Cir.
1982). The ALJ based his determination that Ms. Smith is not
disabled on the VE's response to a hypothetical question.[10] Ms.

---

[10] The Commissioner contends that the ALJ also relied on a
"framework application" of the Commissioner's Medical Vocational
Guidelines, 20 C.F.R. Subpart P, Appendix 2 (the "Grid") to
determine that there were jobs in the national economy which Ms.
Smith could perform. The Grid simplifies the task of determining
whether jobs which claimants (who have reached step five of the
sequential evaluation) could perform exist in the national
economy by categorizing claimants, then declaring whether each
category is "disabled," meaning that no jobs exist which
claimants in that category could perform. In <u>Heggarty v.</u>
<u>Sullivan</u>, 947 F.2d 990 (1st Cir. 1991), the First Circuit
succinctly explained the function of the Grid in the ALJ's
evaluation:

> [T]he burden is on the Secretary to demonstrate that
> there are jobs in the national economy that claimant
> can perform. <u>See</u> <u>Ortiz v. Secretary of Health and</u>
> <u>Human Services</u>, 890 F.2d 520, 524 (1st Cir. 1989).
> Where a claimant's impairments involve only limitations
> in meeting the strength requirements of work, the Grid
> provides a "streamlined" method by which the Secretary
> can carry this burden. <u>Ortiz</u>, 890 F.2d at 524; <u>Sherwin</u>
> <u>v. Secretary of Health and Human Services</u>, 685 F.2d 1,

Smith argues that the Commissioner erred in five ways.[11]  First,

    4 (1st Cir. 1982), <u>cert. denied</u>, 461 U.S. 958, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983).  Where a claimant has nonexertional impairments in addition to exertional limits, the Grid may not accurately reflect the availability of jobs such a claimant could perform. <u>Ortiz</u>, 890 F.2d at 524; <u>Gagnon v. Secretary of Health and Human Services</u>, 666 F.2d 662, 665 n.6 (1st Cir. 1981).  The question whether the Secretary may rely on the Grid in these kinds of situations depends on whether claimant's nonexertional impairment "significantly affects [a] claimant's ability to perform the full range of jobs" at the appropriate strength level.  <u>Lugo v. Secretary of Health and Human Services</u>, 794 F.2d 14, 17 (1st Cir. 1986)(per curiam); <u>Ortiz</u>, 890 F.2d at 524.  If the occupational base is significantly limited by a nonexertional impairment, the Secretary may not rely on the Grid to carry the burden of proving that there are other jobs a claimant can do. <u>Id.</u> Usually, testimony of a vocational expert is required.  <u>Id.</u>

<u>Heggarty</u>, 947 F.2d at 995-96.

The ALJ found that Ms. Smith had a nonexertional limitation of needing to be able to stand or sit at her option throughout the work day.  According to SSR 83-12, an individual with this limitation "is not functionally capable of doing . . . the prolonged sitting contemplated in the definition of sedentary work. . ."  Because her need to be able to sit or stand at will significantly limits the range of sedentary jobs which Ms. Smith could perform, the Grid cannot provide substantial evidence that there are jobs which Ms. Smith could perform.  <u>See, e.g.</u> <u>Jesurum v. Secretary of the U. S. Dept. of Health & Human Services</u>, 48 F.3d 114, 120 (3d Cir. 1995); <u>Born v. Secretary of Health & Human Services</u>, 923 F.2d 1168, 1173 (6th Cir. 1990); <u>Walker v. Bowen</u>, 826 F.2d 996, 1003 (11th Cir. 1987); <u>Gibson v. Heckler</u>, 762 F.2d 1516, 1521 (11th Cir. 1985). Therefore, I examine whether the VE's testimony is substantial evidence that there are jobs which Ms. Smith could perform.

she argues that the ALJ failed to communicate clearly to the VE the functional limitations he was assuming. Second, she argues that the ALJ was biased, and pushed the VE to name some jobs which she could perform. Third, she argues that the ALJ failed to include all of her functional limitations in his hypothetical questions. Specifically, she argues that the ALJ failed to include limitations noted by Dr. Fuchs in a post-hearing exam ordered by the ALJ. Fourth, she argues that the ALJ wrongly discredited her subjective complaints of pain. Fifth, she argues that the Appeals Council erred by ignoring New York State's determination, based on the same standards, that Ms. Smith was disabled for purposes of Medicaid eligibility on September 1, 1992.

## 1.   Was the ALJ's hypothetical question ambiguous?

If a hypothetical question posed to a VE fails to incorporate accurately the ALJ's findings, the VE's response to the question cannot satisfy the Commissioner's burden of proof at

---

[11]   Ms. Smith's representative did not object to the ALJ's hypotheticals at the hearing and declined to cross-examine the VE. The Commissioner does not argue that Ms. Smith thereby waived her right to judicial review on these issues. Furthermore, in Gamer v. Secretary of Health and Human Services, 815 F.2d 1275, 1280 (9th Cir. 1987), the Ninth Circuit rejected the government's argument that Gamer's attorney waived any objection to the ALJ's hypothetical by failing to question the VE at the hearing. Therefore, I proceed to decide the case on the merits.

step five.  See Arocho v. Secretary of Health and Human Services, 670 F.2d 374, 375 (1st Cir. 1982).  In Arocho, responding to a questionnaire, an orthopaedic surgeon stated that in an eight-hour work day, the claimant could sit for a maximum of three hours, stand for a maximum of three hours, and walk for a maximum of two hours.  Id.  A neurologist responding to the same question stated that the claimant could sit for two hours, stand for two hours, and walk for two hours.  Id.  Whether the orthopaedic surgeon and the neurologist meant that the claimant could perform these activities no matter what else he did, or that the claimant could perform each activity for the stated length of time only if he did nothing else, was ambiguous.  Id. at 375-76.  The court first faulted the ALJ for failing to resolve this ambiguity.  Id. at 376.  Next, it reasoned that even if the evidence were interpreted in the manner ascribing the most capacity to the claimant, the claimant could work a full eight-hour day only if he were able to stand for a total of exactly three hours, to sit for a total of exactly three hours, and to walk for a total of exactly two hours.  As the ALJ had asked the VE to assume only that the claimant needed to "alternate position, sit or stand," and had not communicated any maximum time-limits for these activities, the court held that the VE's testimony was

12

irrelevant.  Id. at 375, 376. It explained:

> [F]or a vocational expert's answer to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities. To guarantee that correspondence, the Administrative Law Judge must both clarify the outputs (deciding what testimony will be credited and resolving ambiguities), and accurately transmit the clarified output to the expert in the form of assumptions. (Emphasis added).

Id.

In this case, the ALJ found that Ms. Smith's ability to perform sedentary work was diminished by her need "to alternate between sitting and standing at her option during the work day." He based his conclusion that Ms. Smith can find work in the national economy on the following exchange:

[ALJ] Now, let us assume a 45 to 47 year old woman with a 12th grade education equivalency, has performed semi-skilled work and even without transferable skills, would not be disabled as I say if she could do sedentary work, but let's add to that the fact that she would have to do sedentary work at which she could sit or stand at her option, under those circumstances, are there any type of work such a person would be able to do?

[VE] No, Your Honor.

[ALJ] There aren't any jobs that somebody could sit or stand at and do which fall within the sedentary category?

[VE] There are jobs she could do but at the terms of what I look at to be maybe a reasonable point of time, 25 to 30 minutes, whereas--

[ALJ] No, you don't go by what she says. You don't go by her symptoms on my hypothetical.

13

[VE] -- I understand, Your Honor.

[ALJ] My hypothetical assumes that this woman, my hypothetical woman, can sit and stand and do a sedentary type job.  All I want from you is the kind of a job that would allow a person to sit or stand at option but would be within the sedentary class as to weight?

[VE] Okay, I understand. Information clerk which -- and also an order clerk, order filler, two positions.

[ALJ] Anything else?

[VE] That's it right now, Your Honor.

[ALJ] How many of these jobs would be in existence in the Rhode Island, Southeast Mass region?

[VE] An information clerk would be at least 970 in Rhode Island  and the order filler would be at least 810.

[ALJ] Is that both of them, the clerk and the filler?

[VE] Right.

[ALJ] Any questions?

[Plaintiff's attorney] No, Your Honor.

Given the context of the second hypothetical, it is unclear whether the ALJ was telling the VE to assume (1) that Ms. Smith had to be able to alternate between sitting and standing whenever she wished and as often as she wished, or (2) that Ms. Smith had to be able to change position at least every twenty-five to thirty minutes, or (3) that Ms. Smith had to be able to choose

14

whether to sit or stand, but could sit or stand for a period longer than twenty-five to thirty minutes.  Therefore, a remand is required to clarify the VE's testimony on this point.[12]

_____

[12] Ms. Smith also argues that the term "sedentary," which the ALJ never defined, was ambiguous.  She cites no First Circuit cases, however, to support the proposition that an ALJ may not include a general exertional level in a hypothetical question to a VE.    The Eighth Circuit has stated that general exertional levels in hypotheticals are imprecise and usurp the function of the VE.  See Gilliam v. Califano, 620 F.2d 691, 694 (8th Cir. 1980); Bastian v. Schweiker, 712 F.2d 1278, 1282 n.5 (8th Cir. 1983); Simonson v. Schweiker, 699 F.2d 426, 430 (8th Cir. 1983). In these cases, however, the hypotheticals were defective primarily because the exertional level assumed by the ALJ was at odds with the claimant's actual impairments, not because the general exertional level was too vague.  Gilliam, 620 F.2d at 693-94 (hypothetical stating claimant capable of light or exertional work defective because failed to include claimant's inability to put on shirt without assistance, tie shoes, operate light switch, or walk 150 feet); Bastian, 712 F.2d at (hypothetical assuming claimant capable of sedentary work failed to include claimant's pain); Simonson, 699 F.2d at 340 (same). See also Brown v. Bowen, 801 F.2d 361, 363 (10th Cir. 1986) (that ALJ did not "fully itemize" claimant's impairments did not make hypothetical defective); Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) ("[D]ecisions critical of hypotheticals that ask a vocational expert to assume a particular physical capability on the part of the claimant all address situations where there was no evidence to support the assumption underlying the hypothetical.") Furthermore, the First Circuit has upheld denials based on hypotheticals using general exertional categories.  See, e.g., Berrios Lopez v. Secretary of Health and Human Services, 951 F.2d 427, 428-29 (1st Cir. 1991); Irlanda Ortiz, 955 F.2d at 769.  In the absence of evidence or case-law to the contrary, it is safe to assume that the ALJ and the VE understood "sedentary" as it is defined in the Dictionary of Occupational Titles:

> Exerting up to 10 pounds of force occasionally . . .
> and/or a negligent amount of force frequently . . . to
> lift, carry, push, pull, or otherwise move objects,

## 2. Did Ms. Smith receive a fair hearing?

Plaintiff contends that in questioning the VE, the ALJ exhibited bias against her and that she therefore did not receive a fair hearing. Due process requires an impartial decision-maker in administrative as well as judicial proceedings. Schweiker v. McClure, 456 U.S. 188, 195-96 (1982). There is a "presumption of honesty and integrity in those serving as adjudicators," however, which plaintiff must overcome to prevail on a claim of bias. Withrow v. Larkin, 421 U.S. 35, 47 (1975). See also Schweiker, 456 U.S. at 195; Soule Glass and Glazing Co. v. N.L.R.B., 652 F.2d 1055, 1112 (1st Cir. 1981). The ALJ's questioning of the VE is insufficient to overcome this presumption. Although the ALJ's questioning of the VE was not sufficiently clear to permit a conclusion that a substantial number of jobs exist in the national economy that plaintiff could perform, it does not demonstrate that the ALJ was biased against the claimant.

---

including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

Dictionary of Occupational Titles 1013 (4th ed. 1991).

Therefore, I hold that the ALJ did not err in using a general exertional level in his hypothetical question.

16

**3.   Did the ALJ include all of Ms. Smith's impairments in his hypothetical?**

Ms. Smith next argues that the ALJ failed to ask the VE to consider her right arm weakness, headaches and dizziness, total aversion to dust, fumes, or gases, moderate aversion to sudden changes in temperature and humidity, moderate aversion to unprotected heights, total inability to crawl, and inability to bend, squat, or climb more frequently than occasionally. Although the Commissioner bears the burden of proving that the claimant can work despite her disability, the claimant has the ultimate burden of proving that she is disabled. See Johnson v. Shalala, 60 F.3d 1428, 1431 (9th Cir. 1995).

Concerning the weakness of her right arm, Ms. Smith testified that there were days when she could not lift her arms without pain. There is some medical evidence supporting Ms. Smith's claim.  On April 8, 1992, she went to the Taylor Brown Health Center complaining of pain in her upper back which radiated into her right shoulder, and occasional aches in her right arm.  Based on X-rays and an examination, Dr. Gregoire diagnosed a dextroscoliotic mid-cervical curve with loss of cervical lordosis, consistent with muscle spasm, and degenerative disc disease at C6-7.  On October 23, 1992, Ms. Smith visited Dr. Yutango due to increased pain in her right shoulder.  Dr.

17

Yutangco diagnosed bursitis in her right shoulder. After the hearing, at the request of the ALJ, Ms. Smith saw Dr. Fuchs, an orthopaedist. Dr. Fuchs noted that a "[n]eurologic exam revealed diminution of the entire right upper extremity," that Ms. Smith's grip strength was zero bilaterally, and that she had a reduced range of motion in the joints of her right arm due to pain.

There is, however, substantial evidence that any weakness in Ms. Smith's right arm would not prevent her from performing sedentary work, i.e. from exerting ten pounds of force occasionally and a negligible amount of force frequently. Dr. Fuchs also reported that Ms. Smith could lift and carry 21-25 pounds occasionally, 11-20 pounds frequently, and 6-10 pounds continuously. Concerning Ms. Smith's hands, he reported that she could repeatedly grasp, push and pull, and perform fine manipulations. Dr. Fuchs concluded that Ms. Smith was "fully capable of performing clerical-type sedentary activities." Thus, the ALJ did not err in excluding Ms. Smith's claimed right arm weakness from his hypothetical question.

Ms. Smith also testified in passing that she sometimes becomes dizzy when she bends and tips her head, and that when she sleeps poorly, she has a lot of headaches the next day. The only

18

evidence she cites in support of these impairments is a cursory note from her treating chiropractor, Dr. Deutsch. Ms. Smith does not contend that the ALJ erred by rejecting Dr. Deutsch's conclusion that she is unable to work. Instead, she contends that the ALJ failed to give due weight to Dr. Deutsch's statement that Ms. Smith suffers headaches and dizziness due to a degenerative disc problem in her cervical spine in deciding whether she actually suffered these impairments.

According to 20 C.F.R. § 404.1513, a chiropractor is not an acceptable medical source of evidence of an impairment. A chiropractor's opinion, under the regulations, is entitled to no more weight than the opinion of any other non-medical source. Because the claimant bears the burden of proving impairments, the ALJ is free to reject a treating chiropractor's opinion as to an impairment even if there is no evidence to the contrary in the record. Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995) (ALJ properly discredited treating chiropractor's opinion that claimant could not sit for longer than one hour where physicians did not indicate that plaintiff had trouble sitting). The ALJ correctly noted that Dr. Deutsch submitted no records in support of his claim that Ms. Smith suffered from headaches and dizziness. He also correctly noted that the record is otherwise

19

devoid of evidence that Ms. Smith suffers from headaches and dizziness. Therefore, I hold that the ALJ did not err by excluding headaches and dizziness from his hypothetical.

Ms. Smith also contends that the ALJ failed to ask the VE to consider several impairments noted by Dr. Fuchs after the hearing. Although he opined that Ms. Smith was capable of sedentary work, Dr. Fuchs also reported that she had a total aversion to dust, fumes, or gases, a moderate aversion to sudden changes in temperature and humidity, a total inability to crawl, and an inability to bend, squat, or climb more often than occasionally.[13] The ALJ noted some of the limitations Dr. Fuchs reported, but never explicitly decided whether Ms. Smith is so limited and, more importantly, never explained why it was unnecessary to include these limitations in his hypothetical. There is no evidence in the record that Ms. Smith does not have the impairments which Dr. Fuchs reported. Furthermore, the ALJ relied heavily on Dr. Fuchs's evaluation in determining whether Ms. Smith was disabled because the other evidence of her abilities was "very sparse." Under these circumstances, the ALJ

_____

[13] Ms. Smith does not argue that the ALJ also failed to include Dr. Fuchs' finding that she could not sit for more than a total of six hours in an eight-hour work day, nor either stand or walk for more than a total of four hours in an eight-hour work day.

should have included Ms. Smith's total aversion to dust, fumes, or gases, moderate aversion to sudden changes in temperature and humidity, total inability to crawl, and inability to bend, squat, or climb more often than occasionally in his hypothetical question, or explained why it was unnecessary to do so.

**4.    Did the ALJ wrongly discredit Ms. Smith's subjective complaints of pain?**

Ms. Smith also alleges that the ALJ improperly discredited her subjective complaints of pain in formulating his hypotheticals. Once a claimant presents a "clinically determinable medical impairment that can reasonably be expected to produce the pain alleged," the ALJ must consider the claimant's subjective complaints of pain. Avery v. Secretary of Health and Human Servs., 797 F.2d 19, 21 (1st Cir. 1986); accord 42 U.S.C.A. § 423(d)(5)(A) (Supp. 1995); 20 C.F.R. §§ 404.1529(c), 416.929(c). In determining the weight to be given to allegations of pain, the claimant's complaints "need not be precisely corroborated by objective findings, but they must be consistent with medical findings." Dupuis v. Secretary of Health and Human Services, 869 F.2d 622, 623 (1st Cir. 1989). When the claimant's reported symptoms of pain are significantly greater than the objective medical findings suggest, the ALJ must consider other relevant information to evaluate the claims.

21

Avery, 797 F.2d at 23. The ALJ must inquire about the claimant's daily activities; the location, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; the characteristics and effectiveness of any medication, treatments, or other measures the claimant is taking or has taken to relieve pain; and any other factors concerning the claimant's functional limitations due to pain. 20 C.F.R. §§ 404.1529(c)(3), 416.1529(c)(3); Avery, 797 F.2d at 23. If the ALJ has considered all relevant evidence of the claimant's pain, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." Frustaglia v. Secretary of Health and Human Services, 829 F.2d 192, 195 (1st Cir. 1987).

The ALJ found that Ms. Smith had a medical impairment, probably degenerative disc disease, which could reasonably be expected to produce the kind of pain she alleged. He also found, however, that her complaints of pain were significantly greater than the objective medical evidence suggested, and that Ms. Smith greatly exaggerated the severity of her pain. Ms. Smith testified that her pain was "like a knife being stuck in my back and then

22

other times its like a toothache, like a throbbing." She stated that she had this pain every morning, but that it became "bearable" around ten or eleven o'clock. She further testified that standing or sitting for more than twenty minutes, walking more than two blocks, bending, twisting, and turning aggravated her pain, and that lifting anything caused instant pain. She also testified that she had cried herself to sleep for the past week because her lower back hurt so much, and that the pain prevented her from sleeping well four to five nights per week.

The ALJ did not believe Ms. Smith's description of her pain primarily because he found it inconsistent with her description of her daily activities. In reaching this conclusion, the ALJ misconstrued Ms. Smith's testimony and written statements in the record in a number of ways. Ms. Smith testified that she was unable to climb stairs. The ALJ apparently disbelieved this testimony because Ms. Smith testified that she lived in a two-story house, although she also testified that she never leaves the first floor.

Ms. Smith testified that her chiropractor, Dr. Deutsch, told her to do "no vacuuming, no sweeping, and if I stand to do dishes, do them a little at a time and sit, not to be standing at the sink for a long period." She later testified that she cooks.

23

The ALJ related this testimony as follows:

> In describing her daily activities, the claimant initially testified that her treating chiropractor has strongly recommended that she perform no household chores. However, the claimant did admit that she cooks meals and washes dishes, a few at a time.

Contrary to what the ALJ implies, Ms. Smith did not claim to be unable to do housework, then contradict herself. Neither did she claim that Dr. Deutsch told her not to do housework, then "admit" that she washed dishes a few at a time. Rather, she stated that, consistent with Dr. Deutsche's recommendation, she washes dishes a few at a time and cooks.

> The ALJ also misconstrued a Disability Report which Ms. Smith submitted. The ALJ states:

> In fact, the claimant stated in a disability report completed in August, 1992 that she cooks, washes dishes, washes laundry, makes the bed, dusts the furniture, and goes out shopping with her husband (Exhibit 14). The performance of these chores is seemingly inconsistent with the claimant's testimony that she is unable to lift "anything."

In fact, Ms. Smith completed the report in April, not August. Her own description of her housework in the report is not at all inconsistent with her complaints of pain. She wrote:

> I do the cooking and wash the dishes. My husband vacuums and shakes out the rugs. He carries laundry baskets but I do the laundry. I make the bed and dusting (sic) as long as I don't have to bend or reach. My husband and I shop together. He carries the bags for me. I have trouble shopping long without sitting

24

down. I don't shop alone. (Emphasis added).

The ALJ also states that Ms. Smith "enjoys watching television and visiting with family and friends."[14] In the Disability Report, Ms. Smith wrote:

> I do visit and I am in pain while visiting, but I am in pain if I stay home, too. Some days I am in more pain than others and on bad days I don't leave the house at all. I don't drive much anymore because my left leg becomes numb while driving and I get nervous about whether it's safe to drive that way. (Emphasis added).

The ALJ also claimed that Ms. Smith stated that she "enjoyed" crocheting, and stated: "In light of the claimant's previous testimony concerning her hand and arm problems, this Administrative Law Judge cannot understand how she could possibly crochet." In fact, Ms. Smith stated only that she crochets "a little."

The ALJ found it significant that Ms. Smith "did not complain of any difficulty in caring for personal needs in her reconsideration disability report completed in December, 1992 (Exhibit 16)." Ms. Smith completed that report in January of 1986, not December of 1992. Answering the immediately following questions, she wrote:

---

[14] Because the ALJ never elicited whether Ms. Smith lies down, stands, or constantly shifts position when she watches television and visits, the relevance of this information is questionable.

25

> Unable to do my housework - children have to do most of
> it. I have to stay off my feet as much as possible when
> I'm having a bad day. I usually have to be in a lying
> down position. . . . My disability interferes with my
> personal lifestyle. I'm unable to have sexual
> intercourse with my husband because of my condition.

Although the ALJ set out the Avery framework in his decision, he did not actually apply the guidelines for determining the credibility of a claimant's subjective complaints of pain. Avery clearly states, and the ALJ explicitly acknowledged, that the ALJ must consider the claimant's daily activities. Avery, 797 F.2d 19, 23. The regulations also state that the ALJ must "carefully consider" non-medical evidence, including evidence of the claimant's daily activities. 20 C.F.R. §§ 404.1529(3), 416.929(3). Unlike the ALJ in Frustaglia, the ALJ in this case did not thoroughly consider and evaluate all the evidence of Ms. Smith's pain. See 829 F.2d at 195. Rather, he selected bits from Ms. Smith's testimony and written submissions to the Commissioner which, taken out of context, appear to contradict her complaints of pain. On remand, in accordance with Avery, I direct the ALJ to consider all of the evidence of Ms. Smith's daily activities, including evidence which would suggest that Ms. Smith's subjective complaints of pain are credible, in

26

deciding whether to believe Ms. Smith.[15]  See Wauzinski v.

Shalala, 1994 WL 725176, *10-11 (D.Mass. 1994) (ALJ's finding

that claimant was not credible was not supported by substantial

evidence where ALJ stated that plaintiff did her own shopping,

cleaning, cooking, cared for grandchildren, and drove to Maine,

but record indicated that plaintiff's sister took her shopping,

plaintiff merely dust-mopped the floor of one room, was unable to

prepare more than sandwiches and salads, no longer traveled to

Maine, and did not drive). Cf. Da Rosa v. Secretary of Health and

Human Services, 803 F.2d 24, 26 (1st Cir. 1986) (decision

remanded to Secretary where ALJ failed to apply Avery

guidelines).

5.   **Did the Commissioner err by failing to consider New York
     State's determination that Ms. Smith was disabled for
     purposes of Medicaid eligibility on September 1, 1992?**

Although there is no evidence of the Medicaid determination

in the record besides a statement by Ms. Smith's attorney in his

argument to the Appeals Council, the parties stipulated this

fact.  They did not, however, stipulate that Ms. Smith alerted

---

[15]  The ALJ "must make specific findings as to the relevant evidence he considered in determining to disbelieve the claimant." Da Rosa, 803 F.2d at 26. I note that the ALJ's credibility determination, as he describes it in his decision, is based entirely on matters in the record, not on claimant's demeanor at the hearing.

the ALJ to the Medicaid determination, and there is no evidence in the record to suggest that Ms. Smith notified the Commissioner of the Medicaid determination before her argument to the Appeals Council. When the Appeals Council declined to review Ms. Smith's case, the ALJ's decision of August 8, 1994, became the final decision of the Commissioner. 42 U.S.C.A. § 405(g); 20 C.F.R. § 416.472. Compare Grace v. Sullivan, 901 F.2d 660 (8th Cir. 1990) (holding that Appeals Council's substantive decision, which modified ALJ's decision, was the final decision of the Commissioner and was the only decision subject to judicial review). Because this court has authority to review only final decisions of the Secretary, I lack jurisdiction to review the Appeals' Council's discretionary administrative decision not to review Ms. Smith's case. See Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992). In addition, because the Appeals Council declined to review the ALJ's decision, I may review only the administrative record presented the ALJ; I may not review additional evidence submitted to the Appeals Council. See Eads v. Secretary of Dept. of Health and Human Services, 983 F.2d 815, 816-17 (7th Cir. 1993). Therefore, I cannot consider the Medicaid

28

determination.[16]

## IV. CONCLUSION

For the foregoing reasons, defendant's motion to affirm (document no. 7) and plaintiffs' motion to reverse (document no. 6) are both denied. I remand the case to the Commissioner for further proceedings consistent with this Order.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

March 12, 1996

cc:  David Broderick, Esq.
     Jonathan Baird, Esq.

_____

[16] I note that Ms. Smith does not contend that her attorney's statement meets the standard for "new evidence" which I may order the ALJ to consider upon remand. See 42 U.S.C.A. § 405(g); Evangelista v. Secretary of Health and Human Servs., 826 F.2d 136, 139 (1st Cir. 1987).